1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PETE IBARRA III,

                    Plaintiff,

          v.

SNOHOMISH COUNTY, et al.,

                    Defendants.

CASE NO. C16-0317JLR

ORDER DENYING SECOND
MOTION FOR SUMMARY
JUDGMENT

## I.    INTRODUCTION

Before the court is Marshal Kathy Marino and Marshal James Simoneschi's (collectively, "the Marshals" or "Defendants") second motion for summary judgment. (2d MSJ (Dkt. # 43).)  The court has considered the motion, Plaintiff Pete Ibarra III's opposition to the motion (Resp. (Dkt. # 45)), Defendants' reply in support of their motion (Reply (Dkt. # 48)), the relevant portions of the record, and the applicable law.  Being

//

//

1  fully advised,[1] the court DENIES Defendants' motion for summary judgment for the

2  reasons set forth below.

3  ## II.   BACKGROUND

4  This case arises from an encounter between Mr. Ibarra and Snohomish County

5  ("the County") law enforcement.[2]  (*See* Compl. (Dkt. # 1) ¶¶ 11-19; 2d Ibarra Decl. (Dkt.

6  # 47) ¶¶ 3-9.)  On April 15, 2015, Mr. Ibarra was at the County courthouse complex in

7  Everett "to obtain the court clerk's signature on some anti-harassment materials for a

8  case."  (2d Ibarra Decl. ¶ 3; *see also* 2d Bides Decl. (Dkt. # 44) ¶ 3, Ex. A ("Marino

9  Rep.") at 3-4.)  He contends that he was on his way out of the building when two

10  uniformed marshals informed him that their supervisor, Marshal Marino, wanted to speak

11  with him.  (2d Ibarra Decl. ¶¶ 4-5; *see also* Marino Rep. at 3.)  Marshal Marino arrived

12  and explained to Mr. Ibarra that an attorney in trial at the courthouse complex, Cassandra

13  Lopez de Arriaga, had reported that Mr. Ibarra was stalking her.[3]  (*See* 2d Ibarra Decl.

14  ¶ 6; Marino Rep. at 3-4.)  Mr. Ibarra asserts that after briefly discussing why she stopped

15

16  ───────────

[1] Neither party requested oral argument, and the court concludes that oral argument
would not be helpful to its disposition of the motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

17

18  [2] In moving for summary judgment a second time, Defendants rely on the evidence
provided in connection with their first motion and submit additional evidence.  (*See* 2d MSJ at
2-3 ("Defendants incorporate the facts in the prior filings, and supplement herein.").)

19  Accordingly, the court considers the evidence Defendants and Mr. Ibarra have submitted in
connection with both motions for summary judgment.

20

21  [3] Ms. Lopez represented Mr. Ibarra in a matter during the fall of 2014.  (Lopez Decl.
(Dkt. # 12) ¶ 3; *see also* Marino Rep. at 3.)  Mr. Ibarra contends that he did not stalk Ms. Lopez,
but contacted her to get materials related to the case in which Ms. Lopez represented Mr. Ibarra.

22  (*See* 2d Bides Decl. ¶ 5, Ex. C ("Ibarra Dep.") at 58:11-14, 61:4-5, 62:13-14; 2d Ibarra Decl.
¶ 17.)

ORDER - 2

1    him, Marshal Marino ordered him to leave the courthouse and never return.  (*See* 2d

2    Ibarra Decl. ¶¶ 7-8; *see also* Marino Rep. at 4 (" . . . I told him he needed to leave.").)

3        At this point, the parties' accounts of the incident diverge.  Mr. Ibarra asserts that

4    Marshal Marino said, "Do not come back to this courthouse little man, or you're going to

5    go to jail."[4]  (2d Ibarra Decl. ¶ 8.)  Mr. Ibarra responded, "I might be a little man, but at

6    least I do not have to portray being a man."[5]  (*Id.*; Ibarra Dep. at 62:19-24.)  According to

7    Mr. Ibarra, his comment caused Marshal Marino to "snap," come down the stairs to

8    where Mr. Ibarra was standing, grab his shirt and arm, force his left arm behind his back,

9    and kick his shins.  (2d Ibarra Decl. ¶ 9; Ibarra Dep. at 63:1-5, 7-9.)  Mr. Ibarra also

10   asserts that a male officer—who Defendants assume to be Marshal Simoneschi based on

11   Mr. Ibarra's account—then came up behind Mr. Ibarra and grabbed his hair, which lifted

12   Mr. Ibarra off his feet.  (2d Ibarra Decl. ¶ 9; Ibarra Dep. at 63:11-13; 2d MSJ at 18

13   ("Assuming without conceding, . . . that Marshal Simoneschi was the person grabbing

14   [Mr. Ibarra's] hair . . . .").)  The Marshals then escorted Mr. Ibarra to another area of the

15   courthouse (Ibarra Dep. at 67:6-9) where Mr. Ibarra and the Marshals were "all standing

16

17   ---
     [4] This statement differs somewhat from the statement Mr. Ibarra previously attested that

18   Marshal Marino made.  (*Compare* 1st Ibarra Decl. (Dkt. # 18) ¶ 5 (Marshal Marino "said 'do not
     come back in this courthouse little man.'"), *with* 2d Ibarra Decl. ¶ 8 ("Do not come back to this
     courthouse little man, or you're going to go to jail.").)

19
     [5] In its August 9, 2016 order (8/9/16 Order at 4 n.3), the court disregarded the portion of
20   Mr. Ibarra's declaration—in which he stated that Marshal Marino said "do not come back in this
     courthouse little man" and he responded "at least I do not have to portray being a man" (1st
21   Ibarra Decl. ¶ 5)—that contradicted an allegation in Mr. Ibarra's complaint—that Marshal
     Marino said "not to come back to this courthouse little man, at least I do not have to portray
22   being a man" (Compl. ¶ 13).  The court concluded that Mr. Ibarra improperly recast Marshal
     Marino's statements in an attempt to survive summary judgment.  (*See* 8/9/16 Order at 4 n.3.)

1   there trying to catch [their] breath for a second" when "some other officer" approached

2   (*id.* at 67:17-18, 20).

3        According to Mr. Ibarra, that officer asked, "does [Mr. Ibarra] need to go down?"

4   (*Id.* at 67:25; 2d Ibarra Decl. ¶ 10.)  Mr. Ibarra does not state whether the Marshals

5   responded, but contends that the unidentified officer quickly took Mr. Ibarra "down face

6   first" and kicked his legs out from under him.  (Ibarra Dep. at 68:4-6; 2d Ibarra Decl.

7   ¶ 10.)  Mr. Ibarra contends that the officer then grabbed Mr. Ibarra's wrist, "stuck his

8   knee" in Mr. Ibarra's back, and grabbed Mr. Ibarra by the ear.  (Ibarra Dep. at 68:7-11;

9   2d Ibarra Decl. ¶ 10.)  The officer then struck Mr. Ibarra's head on the ground several

10  times.  (2d Ibarra Decl. ¶ 10; *see also* Ibarra Dep. at 68:10-11.)  Mr. Ibarra contends that

11  he defecated in his pants during this assault.  (2d Ibarra Decl. ¶ 15; Ibarra Dep. at

12  68:19-21.)

13       The Marshals describe a different set of facts beginning from the time Marshal

14  Marino told Mr. Ibarra to leave the courthouse.  After Marshal Marino told Mr. Ibarra to

15  leave, the Marshals say that Mr. Ibarra began walking down the stairs but then stopped,

16  turned around, squared up to Marshal Marino, and stared at her.[6]  (Marino Decl. (Dkt.

17  # 15) ¶¶ 7-8.; *see also* Simoneschi Decl. (Dkt. # 13) ¶ 4.)  Marshal Marino interpreted

18  this stance as a "pre-attack" posture and approached Mr. Ibarra to escort him out.  (*Id.*

19

20            [6] As the court noted in its August 9, 2016, order, Marshal Marino made no mention of
    Mr. Ibarra's allegedly aggressive posture when she composed her report shortly after the
21  courthouse incident.  (*Compare* Marino Rep. at 3, *with* Marino Decl. ¶ 8; *see also* 8/9/16 Order
    at 20 n.12.)  The court concluded that based on this inconsistency, a jury could reasonably find
22  Marshal Marino's statements about Mr. Ibarra's alleged aggressive stance not credible.  (8/9/16
    Order at 20 n.12.)

¶ 8.)  She again ordered Mr. Ibarra to leave, but he "refused to leave and stood in the stairwell partially blocking the traffic."  (*Id.*)  She and Marshal Simoneschi then took Mr. Ibarra by the arm, but he resisted.  (*Id.*)  He grabbed the handrail, screamed, and tensed his muscles to prevent the Marshals from moving him.  (*Id.*)  Marshal Marino stood below Mr. Ibarra on the stairs and was in danger of falling backwards down the stairs because of where she was standing and Mr. Ibarra's resistance.  (*Id.*; Simoneschi Decl. ¶ 4; Scott Decl. (Dkt. # 14) ¶ 4.)  With the assistance of a corrections officer, the Marshals brought Mr. Ibarra down to the ground floor where they put him face down on the carpet and handcuffed him.  (Marino Decl. ¶ 9; Simoneschi Decl. ¶ 4; Scott Decl. ¶ 4.)  Defendants deny that Marshal Marino called Mr. Ibarra a "little man" or that the Marshals pulled Mr. Ibarra's hair, kicked him, threw him to the ground, kneed him, or slammed his head into the ground.  (*See* Marino Decl. ¶ 10; Simoneschi Decl. ¶ 5; Scott Decl. ¶ 5.)  They also deny that Mr. Ibarra defecated in his pants.  (*See* Marino Decl. ¶ 10; Simoneschi Decl. ¶ 5; Scott Decl. ¶ 5.)

After handcuffing Mr. Ibarra, Marshal Marino transported him to the County jail and booked him for disorderly conduct.  (Marino Decl. ¶ 9.)  Nurse Autumn Kostelecky interviewed and assessed Mr. Ibarra when he arrived at the jail.  (*See* Kostelecky Decl. (Dkt. # 11) ¶¶ 2-4.)  Although Ms. Kostelecky avers that she "did not observe any contusions, erythema, edema, or abrasions to [Mr. Ibarra's] shin or head" (*id.* ¶ 5), Mr. Ibarra asserts that he told Ms. Kostelecky that the Marshals had injured him (2d Ibarra Decl. ¶ 14).  Ms. Kostelecky states that she did not observe that Mr. Ibarra defecated in

1    his pants and that he did not inform her he had done so.  (Kostelecky Decl. ¶ 5.)  Mr.

2    Ibarra explains, "I did not tell the nurse that I pooped in my pants because I was too

3    embarrassed." (2d Ibarra Decl. ¶ 15.)  After approximately five hours, Mr. Ibarra posted

4    bond and was released from jail.  (*Id.* ¶ 16.)  The County did not file charges against him.

5    (*Id.* ¶ 18.)

6        Two weeks later, Mr. Ibarra visited a physician's assistant named David Bender.

7    (1st Bides Decl. (Dkt. # 16) ¶ 4 ("Claim Form Attach. 3") at 1.)  Mr. Bender diagnosed

8    Mr. Ibarra with the following injuries:  (1) head contusion, (2) multiple leg contusions,

9    and (3) lumbar strain.  (*Id.* at 2.)  Mr. Bender's notes do not indicate the extent to which

10    he examined Mr. Ibarra (*see id.* at 1-4), and neither side has submitted deposition

11    testimony or a declaration from Mr. Bender or any other medical providers (*see* Dkt.).

12    Since the incident, Mr. Ibarra contends that he lives with "continuous neck, head, and

13    back pain" for which he has seen his regular physician and a neurologist, changed the

14    "medication dosage" for his fibromyalgia, and "received injections." (2d Ibarra Decl.

15    ¶ 19.)  He also contends that he has difficulty sleeping due to the incident.  (*Id.* ¶ 20.)

16        Mr. Ibarra filed this lawsuit on March 3, 2016.  (Compl. at 1.)  He asserted federal

17    claims under 42 U.S.C. § 1983 for unlawful seizure and arrest without probable cause in

18    violation of the Fourth Amendment; excessive force in violation of the Fourth

19    Amendment; and retaliatory arrest in violation of the First, Fourth, and Fifth

20    Amendments.  (*Id.* at 5-8.)  He sought to hold the County liable for these alleged

21    violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  (*Id.* at

22    8-10.)  In addition, he asserted state law claims for false arrest and imprisonment, assault

ORDER - 6

1    and battery, and intentional infliction of emotional distress.  (*Id.* at 10-11.)  He sought to

2    hold the County vicariously liable for the alleged state law violations.  (*Id.* at 12.)

3          On August 9, 2016, the court granted summary judgment on Mr. Ibarra's federal

4    claims for unlawful seizure and arrest, retaliatory arrest, and local government liability

5    and his state claims for false arrest and imprisonment and intentional infliction of

6    emotional distress.  (*See* 8/9/16 Order at 29.)  The court denied summary judgment on

7    Mr. Ibarra's federal excessive force and state law assault and battery claims.  (*See id.*)

8    The court later denied Mr. Ibarra's motion for reconsideration of the court's grant of

9    summary judgment on Mr. Ibarra's state law false arrest and imprisonment and

10   retaliatory arrest claims.  (11/4/16 Order (Dkt. # 31).)

11         On February 14, 2017, Defendants filed this second motion for summary

12   judgment.  (*See generally* 2d MSJ.)  Defendants contend that since filing their first

13   motion for summary judgment, "discovery has been completed, which has narrowed and

14   clarified [Mr. Ibarra's] allegations" and "new case law regarding qualified immunity has

15   been published by the United States Supreme Court and the Ninth Circuit."  (*Id.* at 1.)

16   Defendants seek summary judgment on Mr. Ibarra's federal excessive force claim

17   because, in their view, the doctrine of qualified immunity bars that claim.  (*Id.*)

18   Defendants also request that if the court grants summary judgment on the federal claim,

19   the court decline to exercise supplemental jurisdiction over Mr. Ibarra's remaining state

20   law assault and battery claim.  (*Id.* at 21.)  The court now considers Defendants' motion.

21   //

22   //

ORDER - 7

### III.    ANALYSIS

**A.    Legal Standard**

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of a dispute of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving

1    party to identify specific facts from which a fact finder could reasonably find in the

2    nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

3          The court is "required to view the facts and draw reasonable inferences in the light

4    most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

5    The court may not weigh evidence or make credibility determinations in analyzing a

6    motion for summary judgment because these are "jury functions, not those of a judge."

7    *Anderson*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party "must do more than

8    simply show that there is some metaphysical doubt as to the material facts . . . . Where

9    the record taken as a whole could not lead a rational trier of fact to find for the

10   nonmoving party, there is no genuine issue for trial."  *Scott*, 550 U.S. at 380 (internal

11   quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

12   475 U.S. 574, 586-87 (1986)).

13         Furthermore, the court may consider only materials that are capable of being

14   presented in an admissible form.  *See* Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am., NT &*

15   *SA*, 285 F.3d 764, 773 (9th Cir. 2002).  "Legal memoranda and oral argument are not

16   evidence and do not create issues of fact capable of defeating an otherwise valid

17   summary judgment."  *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also*

18   *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory

19   allegations unsupported by factual data cannot defeat summary judgment.").  Nor can the

20   plaintiff "defeat summary judgment with allegations in the complaint, or with

21   unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med. Inc.*,

22   343 F.3d 1107, 1112 (9th Cir. 2003).

1    **B.      Motion for Summary Judgment**

2            As a threshold matter, Mr. Ibarra contends that the court should decline to

3    consider this second motion for summary judgment because "the instant motion is based

4    on virtually the same facts as [Defendants'] first motion for summary judgment, and there

5    has not been any change in the law affecting the excessive force claim." (Resp. at 2.)

6    Mr. Ibarra also argues that there is at least a genuine dispute of material fact about

7    whether the level of force the Marshals employed during the incident violated Mr.

8    Ibarra's constitutional rights and whether those constitutional rights were clearly

9    established at the time of the incident. (*Id.* at 11-14.) Mr. Ibarra also argues that the

10   court should retain jurisdiction over his state law assault and battery claim if the court

11   grants Defendants summary judgment. (*Id.* at 14.)

12          1.   Second Motion for Summary Judgment

13          District courts have discretion to entertain second motions for summary judgment.

14   *Hoffman v. Tonnemacher*, 593 F.3d 908, 909 (9th Cir. 2010); *Knox v. Sw. Airlines*, 124

15   F.3d 1103, 1106 (9th Cir. 1997) (holding that a district court may permit successive

16   motions for summary judgment on the issue of qualified immunity). The Ninth Circuit

17   has stated that "allowing a party to file a second motion for summary judgment is logical,

18   and it fosters the 'just, speedy, and inexpensive' resolution of suits." *Hoffman*, 593 F.3d

19   at 911 (quoting Fed. R. Civ. P. 1); *see also id.* at 912 ("Allowing a successive summary

20   judgment motion potentially can save all concerned the far greater expenses of a trial.").

21   However, the Ninth Circuit also cautioned that district courts should "weed out frivolous

22   or simply repetitive motions." *Id.* at 911. In exercising its discretion on this question, a

ORDER - 10

1  district court may consider the following factors:  "'(1) an intervening change in

2  controlling law; (2) the availability of new evidence or an expanded factual record; and

3  (3) [the] need to correct a clear error or prevent manifest injustice.'"  *Brazill v. Cal.*

4  *Northstate Coll. of Pharm., LLC*, No. CIV. 2:12-1218 WBS GGH, 2013 WL 4500667, at

5  *1 (E.D. Cal. Aug. 22, 2013) (quoting *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir.

6  1995)).

7        Although Defendants frame their motion as a "renewed" motion (*see, e.g.*, 2d MSJ

8  at 1), it is in fact a second motion for summary judgment.  Mr. Ibarra "recognizes that a

9  court . . . has the discretion to hear successive motions for summary judgment," but

10  contends that "the instant motion is based on virtually the same facts as [D]efendants'

11  first motion for summary judgment[,] and there has not been any change in the law

12  affecting the excessive force claim."  (Resp. at 2.)  Defendants argue that both parties

13  have put new evidence before the court and the motion "introduces new facts and law

14  that were not available at the time of the first motion for summary judgment."  (Reply at

15  5.)

16        The court will consider Defendants' second motion in the interest of judicial

17  efficiency.  The parties have now completed discovery (*see* Sched. Order (Dkt. # 9) at 1),

18  and the motion is before the court on an expanded factual record, *Brazill*, 2013 WL

19  4500667, at *1.  Even though many of the underlying facts and issues remain the same,

20  there is no indication that Defendants' motion is patently frivolous or simply repetitive.

21  *See Hoffman*, 593 F.3d at 911.

22  //

ORDER - 11

1    2. <u>Excessive Force Claim</u>

2    *a. Integral Participation*

3    The parties next dispute what acts of force the court should consider in evaluating

4 Mr. Ibarra's claim. Defendants contend that they are entitled to qualified immunity based

5 on Mr. Ibarra's allegations that Marshal Marino and Marshal Simoneschi grabbed Mr.

6 Ibarra by the arms and hair, pulled him off the stairs, kicked his shins, and took him to

7 the floor to place handcuffs on him. (*See* 2d MSJ at 3-5.) They argue, however, that

8 because Mr. Ibarra fails to identify the third officer, the court should not consider that

9 officer's use of force—grabbing Mr. Ibarra by the ear, kneeing his back, and striking his

10 head against the floor several times. (*See id.* at 5; *see also* Reply at 4.) Mr. Ibarra, on the

11 other hand, asserts that the Marshals are liable for the unnamed third officer's actions

12 because the Marshals set in motion the third officer's unconstitutional actions and

13 integrally participated in those actions.[7] (*See* Resp. at 12-13.) Defendants counter that

14 //

15

16    [7] Generally, "[a] plaintiff must show that an officer personally participated in the alleged
violation of the plaintiff's constitutional rights." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir.

17 2002). The doctrine of integral participation "extends liability to those actors who were integral
participants in the constitutional violation, even if they did not directly engage in the
unconstitutional conduct themselves." *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009);

18 *see also Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). "Integral participation requires
some *fundamental involvement* in the conduct that allegedly caused the [constitutional]

19 violation." *Monteilh v. Cty. of L.A.*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011). Officers are
fundamentally involved when they "provide some affirmative physical support at the scene of

20 the alleged violation" and "are aware of the plan to commit the alleged violation or have reason
to know of such a plan, but do not object." *Id.* In addition, "[a] supervisor may be held liable

21 under § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient
causal connection exists between the supervisor's unlawful conduct and the constitutional

22 violation." *Lolli v. Cty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003). However, Mr. Ibarra does
not assert a supervisory theory of liability. (*See generally* Compl.; 2d MSJ Resp.)

ORDER - 12

1  Mr. Ibarra failed to plead an integral participation theory of liability and therefore cannot

2  rely on the theory in response to summary judgment.  (2d MSJ Reply at 4.)

3       "A party need not plead specific legal theories in the complaint, so long as the

4  other side receives notice as to what is at issue in the case."  *Am. Timber & Trading Co.*

5  *v. First Nat'l Bank of Or.*, 690 F.2d 781, 786 (9th Cir. 1982) (noting that the plaintiffs

6  conducted discovery on the theory at issue).  However, "summary judgment is not a

7  procedural second chance to flesh out inadequate pleadings."  *Wasco Prods., Inc. v.*

8  *Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).  When a plaintiff "fail[s] to

9  assert any factual allegations in its complaint" to support a theory, the plaintiff's

10  "provision of affidavits and declarations supporting [that theory] at the summary

11  judgment stage is ineffectual."  *La Asociacion de Trabajadores de Lake Forest v. City of*

12  *Lake Forest*, 624 F.3d 1083, 1088-89 (9th Cir. 2010); *see also Pickern v. Pier 1 Imports*

13  *(U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (concluding that the complaint did not give

14  "notice of the specific factual allegations presented for the first time in [the party's]

15  opposition to summary judgment"); *Corona v. Time Warner Cable, Inc.*, No. CV 13-5521

16  PSG (VBKx), 2014 WL 11456535, at *4 (C.D. Cal. Oct. 16, 2014) (finding that the

17  plaintiff's complaint did not encompass the theory raised in response to a motion for

18  summary judgment).  The rationale for this rule rests primarily on the threat of prejudice

19  from a late change in the plaintiff's theory, but the court need not make a finding of

20  prejudice to reject the new theory.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No.

21  M 07-1827 SI, 2012 WL 5411590, at *2 (N.D. Cal. Nov. 6, 2012) (rejecting argument

22  *//*

1   based on factual allegations not in the complaint without making a finding of prejudice);

2   *City of Lake Forest*, 624 F.3d at 1088-89.

3        The court first examines Mr. Ibarra's complaint to determine whether it put

4   Defendants on notice of an integral participation theory of liability.  Mr. Ibarra's

5   complaint alleges that an unidentified officer "threw" Mr. Ibarra "to the ground and

6   began smashing his face into the floor."  (Compl. ¶ 15.)  Mr. Ibarra asserts his excessive

7   force claim against the Marshals and alleges that "[t]he actions of [D]efendants and

8   unknown officers in physically assaulting, pushing[,] and striking [Mr. Ibarra] when no

9   force whatsoever was necessary or appropriate violated" Mr. Ibarra's Fourth Amendment

10   right to be free from excessive force.  (*Id.* ¶ 35.)

11       These statements are the only allegations that can be construed as supporting an

12   integral participation theory of liability.  Although Mr. Ibarra need not specifically plead

13   legal theories in his complaint, his allegations must give Defendants notice of what is at

14   issue in this case.  *See Am. Timber & Trading*, 690 F.2d at 786.  The court concludes that

15   Mr. Ibarra's complaint did not sufficiently notify Defendants that Mr. Ibarra sought to

16   hold them liable for the unidentified officer's conduct on an integral participation theory.[8]

17

18   _____

    [8] Nor does any other filing before the court suggest that Defendants knew Mr. Ibarra
    intended to assert this theory of liability.  Mr. Ibarra argued in opposition to Defendants' first

19   motion for summary judgment that "three law enforcement officers, including two of the
    defendants, grabbed [Mr. Ibarra] by the shirt, hair[,] and arms and took him down to the ground;
    a third officer repeatedly slammed [Mr.] Ibarra's face onto the floor" and that "[t]he force they

20   used under these circumstances was unreasonable as a matter of law."  (1st MSJ Resp. (Dkt.
    # 17) at 6.)  In addition, in its order on Defendants' first motion for summary judgment, the court
    noted the unidentified officer's alleged force—throwing Mr. Ibarra to the ground, kneeing him in

21   the back, lifting him by his ear, and slamming Mr. Ibarra's head into the floor—in its excessive
    force analysis.  (8/9/16 Order at 19, 21.)  However, no party raised the integral participation

22   theory of liability at that time (*see generally* 1st MSJ; 1st MSJ Resp.; 8/9/16 Order), or asserted

1    *See City of Lake Forest*, 624 F.3d at 1088-89; *Pickern*, 457 F.3d at 969.  For this reason,

2    the court does not consider the unidentified officer's actions in deciding the qualified

3    immunity question to which the court now turns.

4                      *b.  Excessive Force & Qualified Immunity*

5            The court next addresses whether qualified immunity absolves the Marshals of

6    liability for their alleged excessive force.  (*See generally* 2d MSJ.)  When evaluating

7    Fourth Amendment claims of excessive force, courts ask "whether the officers' actions

8    are 'objectively reasonable' in light of the facts and circumstances confronting them."

9    *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing

10   of the nature and quality of the intrusion on the individual's Fourth Amendment interests

11   against the countervailing governmental interests at stake."  *Id.* at 396.  "The calculus of

12   reasonableness must embody allowance for the fact that police officers are often forced to

13   make split-second judgments—in circumstances that are tense, uncertain, and rapidly

14   evolving—about the amount of force that is necessary in a particular situation."  *Id.* at

15   396-97.  Reasonableness is evaluated "from the perspective of a reasonable officer on the

16   scene, rather than with the 20/20 vision of hindsight."  *Glenn v. Wash. Cty.*, 673 F.3d

17   864, 871 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 397).  Police officers "need not

18   avail themselves of the least intrusive means of responding"; rather, they need only act

19   //

20

21   ───────────────────

     that the unidentified officer's conduct could be imputed to the two named Marshals.  Further,
22   there is no indication that Mr. Ibarra pursued discovery on this theory.  *Cf. Am. Timber*, 690 F.2d
     at 786 (noting that the plaintiffs conducted discovery on the theory at issue).

1    "within that range of conduct [identified] as reasonable." *Billington v. Smith*, 292 F.3d

2    1177, 1188-89 (9th Cir. 2002).

3        The excessive force analysis involves three steps.  First, a court must "assess the

4    severity of the intrusion on the individual's Fourth Amendment rights by evaluating the

5    type and amount of force inflicted." *Glenn*, 673 F.3d at 871.  Second, a court must

6    "evaluate the government's interest in the use of force." *Id.*  At a minimum, three factors

7    inform the government's interest:  "(1) how severe the crime at issue is, (2) whether the

8    suspect posed an immediate threat to the safety of the officers or others, and (3) whether

9    the suspect was actively resisting arrest or attempting to evade arrest by flight." *Lal v.*

10   *California*, 746 F.3d 1112, 1117 (9th Cir. 2014); *see also Mattos v. Agarano*, 661 F.3d

11   433, 441 (9th Cir. 2011) (noting that these factors are not exclusive and that courts

12   consider "whatever specific factors may be appropriate in a particular case").  Of these

13   factors, the most important is whether the suspect immediately threatened the safety of

14   the officers or others. *Lal*, 746 F.3d at 1117; *see also Glenn*, 673 F.3d at 872.  Finally, a

15   court must "balance the gravity of the intrusion on the individual against the

16   government's need for that intrusion." *Id.*

17       Mr. Ibarra brings his federal claim for excessive force under 42 U.S.C. § 1983.

18   (*See* Compl. at 5-10.)   In the context of 42 U.S.C. § 1983 claims, "[t]he doctrine of

19   qualified immunity protects government officials 'from liability for civil damages insofar

20   as their conduct does not violate clearly established statutory or constitutional rights of

21   //

22   //

1   which a reasonable person would have known.'"[9] *Stanton v. Sims*, --- U.S. ---, 134 S. Ct.

2   3, 4-5 (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

3   "Qualified immunity gives government officials breathing room to make reasonable but

4   mistaken judgments" and "protects all but the plainly incompetent or those who

5   knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting

6   *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Accordingly, an officer will be denied

7   qualified immunity in a Section 1983 action "only if (1) the facts alleged, taken in the

8   light most favorable to the party asserting injury, show that the officer's conduct violated

9   a constitutional right, and (2) the right at issue was clearly established at the time of the

10   incident such that a reasonable officer would have understood her conduct to be unlawful

11   in that situation." *Green v. City & Cty. of S.F.*, 751 F.3d. 1039, 1051-52 (9th Cir. 2014)

12   (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  The court "may

13   exercise discretion in deciding which of the two prongs to address first," *Ames v. King*

14   *Cty.*, 846 F.3d 340, 347 (9th Cir. 2017), and "considers only the facts that were knowable

15   to the defendant officers," *White v. Pauly*, --- U.S. ---, 137 S. Ct. 548, 550 (2017).

16                 i.   Violation of a Constitutional Right

17       Viewing the facts in the light most favorable to Mr. Ibarra and drawing all

18   reasonable inferences in his favor, the court first turns to the type and amount of force

19   used.  According to Mr. Ibarra, while on the stairs, the Marshals grabbed Mr. Ibarra by

20   his arm and shirt, forced his left arm behind his back, pulled him down the stairs, lifted

21

22        [9] The court must not equate "the excessive force question on the merits . . . with the qualified immunity question."  *Brooks v. Clark Cty.*, 828 F.3d 910, 922 (9th Cir. 2016).

1    him off the ground by his hair, and kicked his shins.  (2d Ibarra Decl. ¶ 9.)   The

2    Marshals' force was non-trivial in both kind and amount.  (*See* 2d Bides Decl. ¶ 4, Ex. B

3    ("Bragg Rep.") at 5 ("Transitory pain can be associated with the above tactics"—

4    including joint manipulation and hair holds—"[although] the potential for injury is

5    minimal.").)

6         In contrast, the government interest in the use of force was minimal.  The crimes

7    at issue—stalking, disorderly conduct, and possibly obstruction—are nonviolent

8    misdemeanors and thus not particularly severe.[10]  *See, e.g.*, *Blankenhorn v. City of*

9    *Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (misdemeanor trespass); *White*, 137 S. Ct. at

10   550 (considering only the facts knowable to the officers at the time).  Indeed, Defendants

11   appear to acknowledge that the crimes at issue were not severe.  (*Compare* 1st MSJ at

12   16-17, *with* 2d MSJ at 17-21; *see also* Resp. at 7 (acknowledging that Defendants "tone

13   down their language in their second motion" after "using terms such as 'Class B Felony'

14   and harassment'" in their first motion).)

15        The most important factor in evaluating the government's interest, however, is

16   whether Mr. Ibarra posed an immediate threat to the safety of the Marshals or others.  *See*

17   *Lal*, 746 F.3d at 1117.  Under the version of events most favorable to Mr. Ibarra, Mr.

18   Ibarra posed little or no immediate threat to anyone's safety.[11]  Although Mr. Ibarra may

19

20        [10] *See* RCW 9A.46.110(a) (defining misdemeanor stalking); RCW 9A.84.030(1)(c)
     (defining disorderly conduct); RCW 9A.76.020 (defining obstruction of a law enforcement

21   officer).
          [11] There is a genuine dispute between the parties as to whether Mr. Ibarra's actions put

22   Marshal Marino in danger.  (*Compare* 2d Ibarra Decl. ¶ 9-10, *with* Marino Decl. ¶ 8, *and*
     Simoneschi Decl. ¶ 4.)

1   have been stalking Ms. Lopez while at the courthouse, at the time the Marshals used

2   force on him, he was standing alone on a stairway surrounded by at least two marshals

3   and a corrections officer.  (*See* 2d Ibarra Decl. ¶¶ 5-9; Marino Decl. ¶¶ 7-9; Simoneschi

4   Decl. ¶ 5; Scott Decl. ¶ 4.)  And, according to Mr. Ibarra's version of the facts, no one

5   from the public was present at the time of the incident (Ibarra Dep. 55:13-14), and Mr.

6   Ibarra did not threaten the Marshals or make any attempt to get past them and make his

7   way toward Ms. Lopez (2d Ibarra Decl. ¶¶ 5-9, 11).  Finally, Mr. Ibarra posed little

8   physical danger because he is only five feet and three inches tall, weighs only 145

9   pounds, and was unarmed at the time of the incident.  (Marino Rep. at 4; *see* Ibarra Dep.

10  at 53:18-20.)

11      In addition, according to Mr. Ibarra's version of facts, he did not physically resist

12  or attempt to evade the Marshals by flight.  Viewing the evidence in the light most

13  favorable to Mr. Ibarra, a fact-finder could conclude that in the moments before the

14  Marshals began using force against him, Mr. Ibarra passively—not actively—resisting

15  their commands to leave the building by standing pat on the staircase and speaking back

16  to Marshal Marino.  (*See id.* ¶¶ 8-9 (stating that Mr. Ibarra stopped on the stairway and

17  spoke back); Bragg Rep. at 4 (describing Mr. Ibarra's resistance as "static resistance,"

18  which is characterized by "muscular tension generated by the violator in opposition to the

19  commands of the officer and can often be a precursor to an escalation of resistance").)

20  He attests that even after the Marshals pinned his left arm behind his back, lifted him up

21  by his hair, and kicked his shins, he resisted only by grabbing the railing to steady

22  himself.  (*See* 2d Ibarra Decl. ¶¶ 5-6.)  Based on these facts and all reasonable inferences

1   drawn from them, a reasonable jury could conclude that Mr. Ibarra posed no immediate

2   threat to the Marshals, Ms. Lopez, or anyone else.

3          In *Ames v. King County*, the Ninth Circuit held that a hair hold, a knee to the back,

4   and head slams were reasonable uses of force. *See* 846 F.3d at 344-46. Defendants argue

5   that *Ames* shows that the Marshals' use of force was reasonable. (*See* 2d MSJ at 12-13.)

6   However, Defendants fail to fully acknowledge the unique circumstances that led to the

7   Ninth Circuit's conclusion, none of which are present here. In *Ames*, law enforcement

8   arrived at the scene of a medical emergency and encountered the distraught mother of a

9   young man who had attempted suicide. *Id.* at 343-44. After a disagreement with the

10  authorities on the scene, the mother attempted to load her unconscious son into her truck

11  and drive away from the scene. *Id.* at 344-45. The deputy then pulled the mother from

12  the truck, "employed a hair hold to distract" her, took her "down to the ground in a prone

13  handcuffing position," pushed a knee into her back, and "slammed [her] head into the

14  ground three times." *Id.* at 347. The Ninth Circuit held that the deputy's force was

15  reasonable because the government had a substantial interest in the "ongoing emergency"

16  and the deputy needed to act "in her community caretaking capacity." *Id.* at 348. For the

17  reasons the court identified above, and viewing the evidence in the light most favorable

18  to Mr. Ibarra, no such emergency circumstances justified the Marshals' use of force

19  against Mr. Ibarra. Accordingly, *Ames* does not demonstrate that the Marshals' force was

20  reasonable as a matter of law.

21         Lastly, balancing the governmental interest in the use of force against the amount

22  of force the Marshals employed against Mr. Ibarra, and viewing the facts in the light most

1   favorable to Mr. Ibarra, a reasonable jury could find the Marshals' use of force

2   unreasonable.

3                ii.  Clearly Established Constitutional Right

4        Even though there is a genuine dispute of material fact regarding whether the

5   Marshals' use of force violated Mr. Ibarra's constitutional right, the Marshals are entitled

6   to qualified immunity if that right was not clearly established at the time of the incident.

7   "A clearly established right is one that is sufficiently clear that every reasonable official

8   would have understood that what he is doing violates that right."[12] *Mullenix v. Luna*,

9   --- U.S. ---, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).  The Supreme

10   Court recently "reiterate[d] the longstanding principle that 'clearly established law'

11   should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552 (quoting

12   *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Instead, "the clearly established law

13   must be 'particularized' to the facts of the case."  *Id.* (quoting *Anderson v. Creighton*, 483

14   U.S. 635, 640 (1987)).  Although the case law does not "require a case directly on point

15   for a right to be clearly established, existing precedent must have placed

16   the . . . constitutional question beyond debate." *Id.* at 551 (internal quotation marks

17   omitted).  "[I]t is never enough simply to recite the general proposition that the Fourth

18

---

19      [12] In determining whether a constitutional right was clearly established at the time of the alleged violation, the court considers "binding precedent" from either the United States Supreme

20   Court or the Ninth Circuit. *Boyd*, 374 F.3d at 781.  "If the right is clearly established by decisional authority of the Supreme Court or this Circuit, [the court's] inquiry should come to an end." *Id.*  When there are relatively few cases on point and none of them are binding on the

21   court, the court "look[s] to whatever decisional law is available to ascertain whether the law is clearly established . . . , including decisions of state courts, other circuits, and district courts." *Id.*

22   (internal quotation marks omitted).

1    Amendment prohibits officers from using an amount of force that is objectively

2    unreasonable." *Brooks*, 828 F.3d at 919.

3        Here, the court concludes that Mr. Ibarra's constitutional right was clearly

4    established at the time of the incident.  The Ninth Circuit has held that "the right to be

5    free from the application of non-trivial force for engaging in mere passive resistance was

6    clearly established prior to 2008,"[13] *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093

7    (9th Cir. 2013), and that it is also clearly established that the force used was non-trivial,

8    *see id.* at 1095.  Courts have also held that uses of force similar to those Mr. Ibarra asserts

9    are excessive when the person only passively resists, has committed or is suspected of

10   committing a misdemeanor crime, and poses no immediate threat.  *See Gravelet-Blondin*,

11   728 F.3d at 1093; *Winterrowd v. Nelson*, 480 F.3d 1181, 1184-85 (9th Cir. 2007);

12   *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (concluding that it was clearly

13   established that grabbing the plaintiff by the arms was unconstitutional in light of the fact

14   she was being investigated for nonviolent offenses and posed no safety risk); *Savage v.*

15   *City of Twin Falls*, No. 1:13-CV-00179-EJL-REB, 2015 WL 1635252, at *11 (D. Idaho

16   Apr. 13, 2015) (stating that "[t]he right to be free from the application of non-trivial force

17   for engaging in passive resistance has been clearly established for nearly fifteen years");

18   *see also Young v. Cty. of L.A.*, 655 F.3d 1156, 1168 (9th Cir. 2011) (stating that

19

20       [13] Defendants suggest that earlier Ninth Circuit precedent defines constitutional rights too
     generally when concluding that those rights were clearly established.  (*See* 2d MSJ at 8-9, 16-17
21   (describing an "intra-circuit split").)  Although the court recognizes that the Supreme Court has
     repeatedly cautioned courts not to define a clearly established constitutional right at too general
     of a level, *see White*, 137 S. Ct. at 552, the court must follow this Circuit's precedent unless it is
22   expressly overruled.

1   *Headwaters Forest Def. v. Cty. of Humboldt* ("*Headwaters II*"), 276 F.3d 1125, 1131 (9th

2   Cir. 2002), established that officers use excessive force "when they use pepper spray

3   upon an individual who is engaged in the commission of a non-violent misdemeanor and

4   who is disobeying a police officer's order but otherwise poses no threat to the officer or

5   others"); *Onyenwe v. City of Corona*, 637 F. App'x 370, 371 (9th Cir. 2016) (citing

6   *Winterrowd*, 480 F.3d at 1184-85, for the proposition that "it would have been clear to a

7   reasonable officer that the force applied"—slamming the plaintiff against a car and

8   kicking him—"was unlawful" in light of the fact that the plaintiff was arrested for "a

9   minor crime" and "was not resisting arrest").)  In addition, simply talking back to an offer

10  or refusing to fully comply with an officer's orders does not constitute active resistance.

11  *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (holding that "active

12  resistance is not to be found simply because of a failure to comply with the full extent of

13  an officer's orders").

14       Viewing the facts in the light most favorable to Mr. Ibarra, Mr. Ibarra merely

15  passively resisted the Marshals at the time they used force on him.  Mr. Ibarra attests that

16  he turned away from the Marshals to proceed down the stairs and leave the courthouse

17  (2d Ibarra Decl. ¶ 8), but then stopped on the stairs and spoke back to Marshal Marino.

18  Under Mr. Ibarra's version of events, Marshal Marino then immediately came down the

19  stairs, grabbed Mr. Ibarra's arm, twisted his left arm behind him, and kicked his shins,

20  and Marshal Simoneschi grabbed him by the hair.  (*Id.* ¶ 9.)  Thus, according to Mr.

21  Ibarra, he at most passively resisted Marshal Marino's order to leave the courthouse, to

22  //

1    which the Marshals responded with non-trivial force.[14]  In addition, the circumstances

2    surrounding the incident—that Mr. Ibarra was suspected of committing a misdemeanor,

3    that no one else was near the stairs at the time of the incident, and that Mr. Ibarra had

4    otherwise indicated that he was proceeding to exit the courthouse—indicate that little if

5    any force was justified.  (2d Ibarra Decl. ¶¶ 8, 11; Ibarra Dep. at 55:13-14; Marino Decl.

6    ¶ 5.)  Further, prior to the incident, the Ninth Circuit had held that the kind of force the

7    Marshals used on Mr. Ibarra is non-trivial.  *See, e.g.*, *Meredith*, 342 F.3d at 1061;

8    *Winterrowd*, 480 F.3d at 1184-85.  Thus, the law gave Defendants fair notice that it is

9    unconstitutional to use non-trivial force in the face of passive resistance and no

10   immediate threat.  *See Boyd*, 374 F.3d at 781; *Gravelet-Blondin*, 728 F.3d at 1093.

11          The court also finds Defendants' reliance on *Brooks v. Clark County* misplaced.

12   In *Brooks*, the Ninth Circuit held that there was no clearly established constitutional right

13   to be free from being grabbed and forcefully pushed out of a courtroom after causing a

14   disturbance.  828 F.3d at 920-21.  In recounting the facts, the Ninth Circuit noted that

15   before the bailiff shoved the plaintiff, the plaintiff "had at least twice defied the judge's

16   order to leave; had continued to resist [the bailiff's] verbal instructions to leave; and

17   and . . . two of [the plaintiff's] compatriots had similarly disrupted the court."  *Id.* at 921.

18   On these facts, the Court concluded that "it is simply not 'beyond doubt' that [the bailiff]

19

---

20   [14] The court recognizes that Defendants' expert, Officer Robert Bragg, opines that an
     officer could reasonably believe Mr. Ibarra actively resisted the Marshals' commands by turning
21   around on the stairs, assuming an aggressive posture, and staring at Marshal Marino.  (*See* Bragg
     Rep. at 4.)  Although these facts may suggest a different outcome on the clearly established
22   inquiry, the court must credit Mr. Ibarra's version of the facts—in particular, his claim that he
     did not resist the Marshals—on this motion for summary judgment.

1    employed an unreasonable amount of force." *Id.*  Here, viewing the facts in the light

2    most favorable to Mr. Ibarra, Mr. Ibarra passively resisted the Marshals and did not

3    engage in the kind of active resistance the Ninth Circuit describes in *Brooks*.

4         Further, the court is not persuaded by the Defendants' argument that even if the

5    right was clearly established before *Brooks*, the case has since cast doubt on the Ninth

6    Circuit's earlier excessive force cases.  Without expressly deciding how far *Brooks*

7    reaches, the court notes that the Ninth Circuit decided *Brooks* in 2016—several months

8    after the April 15, 2015, incident between the Marshals and Mr. Ibarra.  *See Brooks*, 828

9    F.3d at 914; (2d Ibarra Decl. ¶ 3.)  Because the court must determine if the right to be free

10   from non-trivial force when exhibiting only passive resistance was clearly established at

11   the time of the incident, the fact that *Brooks* may cast doubt on earlier precedent does not

12   demonstrate that the right was not clearly established as of April 2015.

13        Based on the foregoing analysis and the procedural posture of this case, the court

14   concludes that Defendants fail to establish they are entitled to qualified immunity and

15   denies summary judgment on Mr. Ibarra's excessive force claim.

16        3.   Assault and Battery Claim

17        Mr. Ibarra also brings a state law assault and battery claim against the Marshals

18   (Compl. ¶¶ 48-51), which the court declined to dismiss on Defendants' first motion for

19   summary judgment (*see* 8/9/16 Order at 27).  Because the court denies summary

20   judgment on Mr. Ibarra's federal excessive force claim, the court does not address

21   Defendants' argument that the court should decline to exercise supplemental jurisdiction

22   over Mr. Ibarra's remaining state law claim.  (*See* 2d MSJ at 21); 28 U.S.C. § 1367(c)(3)

1   (stating that a district court "may decline to exercise supplemental jurisdiction over a

2   claim . . . if . . . the district court has dismissed all claims over which it has original

3   jurisdiction").

4                            **IV.    CONCLUSION**

5          For the foregoing reasons, the court DENIES Defendants' second motion for

6   summary judgment (Dkt. # 43).

7          Dated this 3rd day of April, 2017.

8

9                                          _____

10                                         JAMES L. ROBART
                                           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22